UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| In the Matter of the Arbitration | ) | |
| between | ) | |
| | ) | |
| ALEXANDER B. MESHKIN, | ) | |
| NUTZZ.COM, LLC and | ) | |
| BANG RACING, LLC | ) | Case No. |
| | ) | |
| Petitioner(s), | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| VERTRUE INCORPORATED | ) | |
| f/k/a MEMBERWORKS, INC. | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## MOTION TO VACATE AND REMAND ARBITRATION AWARD

Dated: January 22, 2007

Alexander B. Meshkin, Pro Se
19722 One Norman Blvd.
Suite 220
Cornelius, NC 28031
Telephone: (202) 262-7300
Facsimile:  (866) 647-9810

# TABLE OF CONTENTS

I.    INTRODUCTION.................................................................................................................4

II.   BACKGROUND .................................................................................................................5

   A.   THE ARBITRATION ...........................................................................................................6
   B.   THE AGREEMENT ..............................................................................................................7
   C.   FACTS ESTABLISHED DURING THE ARBITRATION .............................................................9
   D.   FRAUDULENT EVIDENCE SUBMITTED AND KEY EVIDENCE WITHHELD BY VERTRUE ......16
   E.   COMPARISON OF NUTZZ ELITE AND FASTTRACK SAVINGS...............................................21
   F.   KEY EVIDENCE WITHHELD BY VERTRUE IN THE ARBITRATION CONFIRMS
         NUTZZ ELITE AND FASTTRACK SAVINGS ARE "SUBSTANTIALLY SIMILAR"......................23
   G.   CARL PERU'S AFFIDAVIT ................................................................................................30
   H.   VERTRUE'S FINANCIAL FORECAST AND EXPECTATIONS ..................................................31

III.  THE TRIBUNAL'S FINDINGS AND MISCONDUCT CONSITUTE GROUNDS FOR VACATING
       AND REMANDING THE AWARD ..................................................................................32

   A.   THE TRIBUNAL'S FAILURE TO ADHERE TO THE AGREEMENT'S TERMINATION PROVISION ...........33
   B.   THE TRIBUNAL'S FAILURE TO HEAR AND CONSIDER THE EVIDENCE THAT
         FASTTRACK SAVINGS WAS "SUBSTANTIALLY SIMILAR" TO NUTZZ ELITE .....................34
   C.   THE MISCONDUCT OF THE TRIBUNAL TRIBUNAL TO REFUSE AND PREVENT CLAIMANTS' COUNSEL TO
         QUESTION WITNESSES AND THE TRIBUNAL'S MISREPRESENTATION OF FACTUAL UNDERSTANDINGS ...........34
   D.   THE TRIBUNAL'S FAILURE TO ENFORCE DISCOVERY ORDERS ..........................................35
   E.   THE TRIBUNAL'S PARTIALITY TO ALLOW RESPONDENT TO SUBMIT WITNESS STATEMENTS FROM
         WITNESSES AFTER THE HEARING DAYS HAD CONCLUDED ..............................................35

IV.   UNDER U.S. LAW THE AWARD SHOULD BE VACATED AND REMANDED TO A NEW
       TRIBUNAL.......................................................................................................................36

   A.   GOVERNING LAW: THE FEDERAL ARBITRATION ACT (FAA)...........................................36
   B.   THE AWARD IS CONTRADICTORY......................................................................................40
   C.   THE AWARD IS INCOMPLETE ...........................................................................................43
   D.   THIS COURT SHOULD REMAND TO A NEW TRIBUNAL .......................................................43
   E.   CONCLUSION....................................................................................................................43
   F.   REQUEST AND MOTION FOR SANCTIONS ...........................................................................44

# TABLE OF AUTHORITIES

**Page**

## CASES

*Aircraft Braking Systems Corp. v. Local 856, Int'l Union, United Auto.,*
*Aerospace and Agr. Implement Workers, UAW,*
97 F.3d 155, 162-63 (6th Cir. 1996) ............................................................................................... 39

*Bell Aerospace Co. Div. of Textron v. Local 516, Int'l, et al.,*
500 F.2d 921, 924-25 (2d Cir. 1974). .............................................................................................. 38

*Brabham v. A.G. Edwards & Sons Inc.,*
376 F.3d 377, 381 (5th Cir. 2004) .................................................................................................... 37

*ConnTech Dev. Co. v. Univ. of Conn. Educ. Props., Inc.,*
102 F.3d 677, 686 (2d Cir. 1996) ..................................................................................................... 37

*Dworkin-Cosell Interair Courier Servs., Inc. v. Avraham,*
728 F. Supp. 156, 161-62 (S.D.N.Y. 1989) ..................................................................................... 37

*Erving v. Va. Squires Basketball Club,*
468 F.2d 1064 (2d Cir. 1972) ........................................................................................................... 39

*Forsythe Int'l, S.A. v. Gibbs Oil Co. of Texas,*
915 F.2d 1017, 1020 (5th Cir. 1990) ................................................................................................ 38

*Grand Rapids Die Casting Corp. v. Local Union No. 159, United Auto.,*
*Aerospace and Agr. Implement Workers of Am., UAW,*
684 F.2d 413, 416 (6th Cir. 1982) .................................................................................................... 38

*Hart v. Overseas Nat'l Airways, Inc.,*
541 F.2d 386, 393-94 (3d Cir. 1976) ............................................................................................... 38

*Hoteles Condado Beach v. Local 901,* 763 F.2d at 40 ...................................................................... 39

*Jeffrey M. Brown Assocs., Inc. v. Allstar Drywall & Acoustics, Inc.,*
195 F. Supp.2d 681, 684 (E.D. Pa. 2002) ........................................................................................ 37

*Karaha Bodas, Co. L.L.C. v. Perusahaan Pertambangan Minyak*
*Dan Gas Bumi Negara,* 364 F.3d at 300-01 .................................................................................... 39

*LaPrade v. Kidder, Peabody & Co., Inc.,* 246 F.3d 702, 706 (D.C. Cir. 2001) ................................ 37

*Matter of Arbitration Between Tempo Shain Corp. v. Bertek, Inc.*
*No. 96 Civ. 3354 (LAP), 1997 WL 580775 (S.D.N.Y. 1997)* ......................................................... 39

*Michaels v. Mariforum Shipping, S.A.,* 624 F.2d 411, 413-14 (2d Cir. 1980) ................................. 37

**TABLE OF AUTHORITIES**
(continued)

*Montes v. Shearson Lehman Bros., Inc.*, 128 F.3d 1456, 1461 (11th Cir. 1997)........................................................37

*Office and Prof'l Employees Int'l Union, Local 2 v. Washington Metro. Area
Transit Auth.*, Civ. A. No. 89-1264(OG),
1990 WL 174892, at *2-3 (D.D.C. Oct 25, 1990) .....................................................................38

*Sea Dragon, Inc. v. Gebr. Van Weelde Scheepvaartkantoor B.V.*,
574 F. Supp. 367, 371 (S.D.N.Y. 1983) ...........................................................................37, 38

*Sheet Metal Workers Int'l Ass'n Local Union No. 420 v. Kinney Air
Conditioning Co.*, 756 F.2d 742, 745 (9th Cir. 1985)......................................................37

*Smart v. Int'l Bhd. of Elec. Workers, Local 702*,
315 F.3d 721, 725 (7th Cir. 2002) ...................................................................................37

*United Mine Workers of Am. v. Dickenson County Med. Ctr.*,
No. 1:00cv00078, ............................................................................................................37

## STATUTES

9 U.S.C. § 10 .....................................................................................................................36

## OTHER AUTHORITIES

*The United Mexican States v. Metalclad Corp.*
(2001), 89 B.C.L.R. (3d) 359 (S.C.),
2001 BCSC 664..................................................................................................................39

## I.    <u>INTRODUCTION</u>

Pursuant to Section 10 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10, Petitioner(s) Alexander B. Meshkin ("Mr. Meshkin"), Nutzz.com, LLC ("Nutzz") and Bang Racing, LLC ("Bang Racing") moves this Court to vacate the award ("the Award") made in the American Arbitration Association Commercial Tribunal of the Agreement (Claimants' Arbitration Exhibit - C-1) between Claimant Nutzz and Respondent Vertrue, Inc. ("Vertrue"), collectively the ("Parties").  Additionally, Nutzz moves this Court to remand the Award to a new arbitral tribunal.

Based on well-settled principles of U.S. arbitration law and precedent, this Court should vacate the Award because the arbitral tribunal ("the Tribunal") engaged in misconduct by effectively refusing to hear and consider evidence pertinent and material to the controversy; engaged in misbehavior by which the rights of Nutzz have been prejudiced; exceeded their powers, or so imperfectly executed them, that a mutual, final, and definite award upon the subject matter submitted was never made; and acted in manifest disregard of the law.

Finally, the Tribunal based its consideration of the issues on the absence of key evidence, though ample evidence on those issues were in fact in the record; the key evidence that was withheld by Vertrue would have provided overwhelming and undisputable proof of the Claimant's claims.

As a result of this misconduct, the Award remains incomplete and contradictory, and disregards controlling legal principles.  U.S. courts have long circumscribed their review of arbitral awards based on the expectation that the arbitrators would uphold the integrity of the arbitral process.  Where, however, the arbitrators breach the integrity of the arbitral process, the principle of arbitral autonomy must yield to judicial review.

Based on the injuries the Petitioner(s) have suffered at the hands of the Tribunal, Petitioner(s) move this Court not only to vacate the Award, but also to remand it to a new tribunal. Petitioner(s) urge the Court to recognize the exceptional nature of the Tribunal's misconduct, and the necessity of remanding to a new arbitral tribunal that will be willing and able to resolve the issues and claims in the dispute.

## II.   <u>BACKGROUND</u>

The Arbitration concerned claims for a breach of contract and the related theft of a cutting edge internet-based membership club and business. On July 16, 2004, Nutzz and the Respondent, Vertrue Incorporated (formerly known as Memberworks, Inc. ("Vertrue")) entered into a contract ("the Agreement") in pursuit of what came to be known as the Nutzz Elite Program ("Nutzz Elite"). Nutzz Elite was an internet membership club; associated with motorsports and geared toward fans of the National Association of Stock Car Auto Racing ("NASCAR"); and to consumers of a broader audience. By letter dated February 10, 2005 – at the time when Vertrue was secretly developing a shadow program to Nutzz Elite – Vertrue sent a purported notice of termination of the Agreement.

The Founder and Chief Executive Officer of Nutzz is Mr. Meshkin. Mr. Meshkin is also the owner of Bang Racing, which participated as a NASCAR race team in 2004 and 2005. At the time the Parties executed the Agreement, Mr. Meshkin was the youngest team owner in the history of NASCAR. As a compliment to his NASCAR endeavors, Mr. Meshkin conceived the idea of marketing a membership club to NASCAR fans, which became known as Nutzz.com and Nutzz Elite.

Following the launch of Nutzz Elite on or about November 17, 2004, (C-94) Vertrue began creating a "Substantially Similar" membership for NASCAR race fans under the name

"FastTrack Savings." This effort was led by Carl Peru ("Mr. Peru") Vice President of Product Marketing for Vertrue. Vertrue's efforts to pursue FastTrack Savings and its ultimate launch; are clear violations of Exclusivity Provision of the Agreement (C-1 at § 19).

## A.     The Arbitration

On August 4, 2005 Nutzz filed a Demand for Arbitration for a breach of contract by Vertrue and damages in excess of $10 Million. The Demand for Arbitration ultimately led to an Arbitration hearing held during July 2006. On June 23, 2006, Nutzz submitted its Pre-Hearing Memorandum/Brief (P-3). Vertrue and the Petitioners are engaged in other related litigation in the Court of Chancery in the State of Delaware and the United States District Court of Connecticut.

Prior and during the Arbitration, Vertrue withheld key evidence to prevent Nutzz from properly presenting its case and prove its claims. Even though the Tribunal had previously ordered Vertrue to produce these highly crucial documents responsive to Claimant's requests in the Arbitration; the Tribunal refused to compel the production and thus prevented Nutzz from a fair, just and impartial hearing (P-2 & P-7).

On July 27, 2005 following the conclusion of the Arbitration hearing, Honorable Peter C. Dorsey, Judge of the U.S. District of Connecticut **Granted** an Emergency Motion to Compel documents that were withheld by Vertrue in the Arbitration and other court cases (P-6). The failure of the Tribunal to compel production of responsive documents, at the request of the Claimant; and to uphold and enforce their previous orders is evident partiality and willful misconduct requiring this Court to vacate the Award.

On September 25, 2006 Nutzz submitted its Post-Arbitration Brief (P-4). The Arbitration Award ("Award") (P-1) was dated October 31, 2006 and delivered to Nutzz on or about

November 1, 2006.  The Award is contradictory and clearly disregards all credible evidence in its findings on the claims of Nutzz; however the Award does not completely disregard the evidence in its findings on the claims of the Respondent, Vertrue.    The contradictions by the Tribunal are contrary to other findings in the Award and the credible evidence; and therefore require this Court to vacate the Award based upon contradictions and arbitral misconduct.

### B.      The Agreement

On July 16, 2004, Nutzz and Vertrue entered into the Agreement (C-1). The Agreement provided for Vertrue and Nutzz to create and develop a certain customized club branded as Nutzz Elite. Nutzz Elite would be marketed to consumers and Vertrue program/club members; enabling them to enroll in Nutzz Elite for an annual fee and receive certain privileges, opportunities and benefits from Vertrue and Nutzz. The initial term of the Agreement was five (5) years and could be terminated only under certain limited conditions.

During the initial term of the Agreement and any subsequent renewal; the Parties agreed to maintain an exclusive relationship with each other; that neither would enter into a relationship or agreement written or unwritten with a third-party to market or sell a "Substantially Similar" program, or a program marketed "in the field of motorsports" (C-1 at § 19).

### 1.      Term and Termination Provision of the Agreement

Section 1 of the Agreement defines the Term and Termination. The initial term of the agreement is five (5) years from the effective date. The Agreement provides Parties the ability to terminate for a material breach or fraud, insolvency or bankruptcy.

It is undoubtedly clear; absent of "the event of fraud, insolvency, bankruptcy, winding-up or liquidation or willful misconduct," the terminating Party must provide a thirty (30) day cure period following an official Notice of Termination; and prior to the termination becoming

effective. Additionally, in Section 1.b, the notice of breach must "set forth the specific nature of each breach upon such termination is based."

Furthermore, Section 1(c) of the Agreement states:

> From the date any notice of termination is given by either Party under this Section, until the effective date of the termination of this Agreement, the Parties shall be obligated to continue to perform pursuant to the terms of this Agreement.

The Notice of Termination dated February 10, 2005 (C-159), did not "set forth the specific nature of each breach upon such termination is based" as required by Section 1 of the Agreement. The Termination Letter did not mention fraud, willful misconduct, insolvency or bankruptcy as the reason for termination; and as such, Vertrue was required to provide a thirty (30) day cure period and to continue to perform its obligations under the Agreement. It is uncontested that Vertrue did not provide any cure period nor continue to perform under the Agreement following the Notice of Termination.

Notice of Termination sent by Vertrue (C-159) states:

> …please take notice that the undersigned hereby terminates the Agreement due to Nutzz' breach of the Agreement (including, but not limited to, Nutzz and Bang Racing, LLC's failure to perform their obligations under Section 2(a) of the Agreement).

The Notice of Termination sent by Vertrue was invalid; the letter did not state the specific breach, but mentioned only Section 2(a); which encompassed the majority of Claimant's obligations. Additionally, the Terminating Party was obligated to continue to perform their obligations pursuant to the Agreement. It is uncontested; and beyond question, that as of February 2, 2005, at the latest, eight (8) days prior to the Notice of Termination, Vertrue stopped performing their obligations pursuant to the Agreement (C-1, C-153 & C-159).

It is undeniably clear from the key evidence withheld by Vertrue and the abundance of evidence set forth in the record; Vertrue did not provide an effective termination letter, nor did it have any intention of providing Nutzz with a thirty (30) day cure period. It is undisputable from

the key evidence, that Vertrue destroyed most of the contents of the Nutzz Elite Welcome Packages/Kits ("Gear Boxes") by February 20, 2005 (VI00340-VI00344); and had earlier on January 28, 2005 (C-144), informed Nutzz that it would not accept any further shipments of merchandise for the Gear Boxes.  It is beyond question, Vertrue had no intention to fulfill its obligations and continue to perform under the Agreement; pursuant to Section 1 of the Agreement; and subsequently deliberately denied Nutzz the thirty (30) day cure period required for an "Effective Termination" (C-1 at § 1).

The Award stipulates and the Tribunal found that Nutzz did not commit fraud or willful misconduct; nor was insolvent or bankrupt. This finding by the Tribunal is contrary to other findings and the credible evidence; and therefore requires this Court to vacate the Award.

## 2.     Exclusivity Provision under the Agreement

Section 19 of the Agreement prevents both Parties from developing or marketing a "Substantially Similar" membership program. Additionally it states, that Vertrue may not market a "Substantially Similar" program in the field of motorsports (C-1 at § 19).

The credible evidence clearly reveals that Vertrue developed and marketed a "Substantially Similar" membership program in the field of motorsports without properly terminating the Agreement. The evidence compelled by the U.S. District Court that was withheld during the Arbitration by Vertrue; provides overwhelming and irrefutable documentation and proof of Claimant's claims. This is indisputable and thus substantiates the ability for Nutzz to vacate the Award.

## C.     Facts Established During the Arbitration

The record evidence demonstrates that Nutzz performed its obligation under the Agreement and put the Parties in a position that, but for delays caused by Vertrue, Nutzz Elite

could have launched on schedule.  The facts of record also establish that after the late launch of Nutzz Elite on or about November 17, 2004 (C-94), Vertrue began demanding more favorable deal terms going forward, and then orchestrated a failed coup by the business partners of Mr. Meshkin to wrest control of Nutzz from him (C-230 & VI00184-VI00185). Ultimately, Vertrue simply stole the Nutzz Elite concept and re-launched it under the name FastTrack Savings.

1.    **Nutzz Membership Programs**

Nutzz operated two levels of membership: (i) a Basic Membership that was free to anyone interested in joining, and (ii) an Elite Membership with an annual fee.  Both levels of membership were available components of Nutzz Elite. Stated differently, an Elite Member was entitled to all the benefits of the Basic Membership, as well as the enhanced benefits available in the "upgraded" Nutzz Elite Program. Both Basic Members and Elite Members were entitled to bid on NASCAR related items in the Nutzz eBay Online Auction using "Nutzz" Points, which they earned as a result of taking certain actions that included purchasing goods and services from Nutzz e-commerce partners.

The Nutzz Basic Membership provided members with the opportunity to earn Nutzz "currency" that could be used in the Nutzz eBay Online Auction. Through various actions, including "upgrading" and becoming a paid Nutzz Elite Member;  all Nutzz members were awarded "Nutzz" which could be then used to bid on motorsports' merchandise and/or services in the Nutzz eBay Online Auction.

The Nutzz Elite Program was an upgrade to the Basic Membership program, and Members were awarded "bonus" Nutzz currency as an incentive to upgrade and become a paid Nutzz Elite Member. The "bonus" Nutzz currency provided the Elite Member with extra bidding power, which could be used in the Nutzz eBay Online Auction.

2.    **Contractual Obligations for Nutzz in 2005**

Nutzz was required to perform only a few, ministerial requirements under the Agreement from 2005 until the Agreement reached its natural termination. Specifically, Nutzz had to: (i) maintain the Nutzz Basic Site and the Nutzz Auction; (ii) provide motorsports content to Nutzz Elite; (iii) conduct trackside marketing; (iv) and to provide merchandise for the Nutzz Elite Gear Boxes. Vertrue's efforts to assert additional responsibilities runs contrary to the expressed terms of the Agreement and, in fact, demonstrates Vertrue's bad faith attempt to extort extra-contractual obligations from Nutzz after Vertrue's management soured on the deal just after the launch (C-1).

3.    **Status of Nutzz in 2005**

The Nutzz Basic Site was operational throughout 2005 including on March 23, 2005, the final day that the enrollment page (landing page) was actively allowing Nutzz Basic Members to enroll in the Nutzz Elite Program (C-213 and C-170). **On March 23, 2005, Edward Miller ("Mr. Miller") registered for Nutzz Elite through the upgrade process on Nutzz.com.** Clearly, without question, this substantiates that Nutzz was fulfilling its contractual obligation pursuant to Section 2a of the Agreement, even though Vertrue attempted to terminate the Agreement on February 10, 2005 (C-168 & C-159). Vertrue has failed to provide any documents to illustrate the source of Nutzz Elite members, following the notice of termination on February 10, 2005. The letter from Mr. Miller was directly sent via U.S. Mail to Nutzz in March 2005. This is currently the only document that proves without a doubt, consumers were actively enrolling in Nutzz Elite through Nutzz.com after February 2, 2005; and following Vertrue's action to disable all transfers of member information to Nutzz (C-216 & C-153).

The Nutzz Auction site was operational at all times prior to the termination letter sent by Vertrue; and at all points prior to Vertrue's action on or about February 2, 2005 to disable the

link from the Nutzz Basic Site to Nutzz Elite, which also disabled the Elite Members access to the auction (C-153) (*See* Tommy Strader's Live Arbitration Testimony). The Nutzz Auction was only discontinued after Vertrue severed the link between the Nutzz Basic Site and Nutzz Elite; and terminated all file transfers to Nutzz containing Member information. File transfers enabled Nutzz to disburse "Nutzz Points" to the Elite Members; and allowed Nutzz to have an accounting of the Nutzz Elite membership base; both of which were crucial to the success of the program.

Nutzz provided motorsports content from the day the Nutzz Auction launched until the day Vertrue's action caused the auction to fail. The Nutzz eBay Online Auction was continuously available to the members from the launch until after the notice of termination was sent by Vertrue to Nutzz; and following Vertrue's actions that lead to the failure of the auction (*See* Tommy Strader's Live Arbitration Testimony).

Nutzz had a full trackside marketing plan in place for Nutzz Elite prior to its launch on November 17, 2004. Nutzz Elite launched at the end of the NASCAR season, on or about November 19, 2004; making it impossible for Nutzz to "attempt to commence marketing." The Agreement did not include a required number of races or the required race venues or locations for marketing at the tracks. It required that Nutzz "attempt to commence marketing" through Trackside Channels. Trackside Channels was further defined as the distribution and marketing of Nutzz Elite from a Trackside Trailer at Race Events (C-1 at p.13). When the 2005 season approached, Nutzz was prepared to begin trackside marketing at Daytona International Speedway during the first race of the 2005 season (NEXTEL® Cup race to occur on February 20, 2005) (C-136 & C-229). However, those efforts were stymied by Vertrue's unlawful termination of the Agreement ten (10) days prior to the race and by Vertrue's active efforts to supplant the trackside marketing efforts of Nutzz with its own plan, formulated with the help of Williams Company of America ("Williams") (VI00524-00533 & VI00565).

In January 2005, Vertrue initiated a plan for independence from Nutzz by replacing Nutzz provided components for the Gear Box. In fact, on January 28, 2005 Tracy Scarfi ("Ms. Scarfi") Senior Director of Product Development at Vertrue told Nutzz that Vertrue would no longer accept any additional shipments of merchandise from Nutzz for the Gear Boxes (C-148). Without question, Vertrue clearly had no intention of continuing to operate under the mutual obligations of the Agreement.

Based on these circumstances, Nutzz was operational and fully performing all its contractual requirements as of the purported termination date of February 10, 2005.  Indeed, Jignesh Patel ("Mr. Patel") Technical Project Leader from inception for Nutzz testified that he was employed and working with Nutzz until May 2005 (P-5).

Vertrue has also attempted to challenge Bang Racing's status at this juncture.  Bang Racing was not a party to the Agreement. The only direct, first-hand testimony Vertrue obtained about Bang Racing was from Vertrue's past business partner and former Nutzz General Counsel, Cameron Tousi.  Cameron Tousi testified that at the time he left Nutzz to negotiate a deal with Vertrue for the replacement FastTrack Saving Program, Bang Racing had a driver, a crew chief and thirty-seven (37) employees (Tousi Trans. at 129:15-130:21).  Mr. Tousi also responded to Vertrue's questioning about the viability of Nutzz at the time of his departure by stating that the Nutzz "operation was in place," that the "offshore company we [Nutzz] had had in India" was in place and that the Meshkin's and Jim Melvin continued to work on the program (Tousi Trans at 148:13-149:5; 149:7-150:2).

4.      **Vertrue Attempted Post Launch to Change the Agreement, Wrest Control of Nutzz from Mr. Meshkin, and Steal Nutzz Elite**

It was not disputed at the Arbitration that Nutzz Elite launched on or about November 17, 2004 (C-94). Additionally, it cannot be contested that Vertrue decided, by the latest January 27,

2005 (C-213) to change the name of Nutzz Elite to FastTrack Savings; and to thereafter maintain the program without Nutzz.  Finally, it is also not contested that Vertrue attempted to terminate the Agreement thereafter by letter dated February 10, 2005 (C-159).

Nutzz Elite launched on November 17, 2004.  Less than a week later on November 23, 2004, Mr. Peru was called to an extremely unpleasant meeting with Gary Johnson ("Mr. Johnson"), Vertrue's Chief Executive Officer.  The e-mails resulting from that meeting illustrate that Vertrue, from its highest levels, pulled its support for Nutzz Elite.  Without any explanation (other than the obvious), Vertrue did not produce emails relating to the Peru/Johnson meeting in the Arbitration.  Clearly, the emails were called for by the discovery requests and the Tribunal's orders.  Nutzz would not have received the e-mails but for the fact that Mr. Peru voluntarily produced them at his deposition for the U.S. District Court of Connecticut litigation between Vertrue and Mr. Meshkin.

The text of a November 24, 2004 e-mail between Mr. Peru and Douglas Weiss ("Mr. Weiss") Senior Vice President of Vertrue recounting the November 23, 2004 Peru/Johnson meeting,  provides direct insight into Vertrue's intentions: (C-203 spelling errors and uppercase letters in original).

> I know you'll say I'm over reacting, but yesterday's meeting really bothers me.  In fact, the more I think about it, and discuss it with those I respect and trust, the more it bothers me.  I really don't understand Gary's accusatory tone.  His elevated decibel level and repeated use of the words "fuck" and "fucking" are disturbing to me.
>
> *      *      *
>
> Relative to NUTZZ, he does not appear top be in favor of the program.  He certainly is not in the loop.  Trust me, Vertrue isn't doing me any favors by launching NUTZZ.  In my mind, I have brought a huge opportunity to this company, and you and Jim [Duffey, Vertrue's ---] seem to agree.  But if all I am going to get is criticism, then let's forget it.  As you know, we can get out of the

> contract by asking for the money back from Bang Racing. Hey it
> will mean less work for me.
>
> I think that you, me Jim and Gary should meet to review NUTZZ
> so that everyone is clear on how we made the decision, who made
> the decision and what the situation is, including the stumbling
> blocks that I have apprised you of along the way. The goal will be
> that we make a decision which all agree with: put up or shut up.

Yet another e-mail not produced by Vertrue, despite the Tribunal's ruling, encapsulates

Vertrue's mindset and intentions with respect to Nutzz Elite after the unpleasant Peru/Johnson

meeting. In an e-mail dated January 26, 2005, Mr. Peru secretly writes to George Blacker, John

Walters, Cameron Tousi and John Adalio; all **former** employees, representatives or shareholders

of Nutzz and Bang Racing:

> Guys:
>
> I am under a lot of pressure here to get a plan in front of my
> management in order to proceed as we all have discussed. I need
> this plan from you. It needs to include: 1. the new management; 2.
> how it will wrest control of Nutzz from Alex; 3. timeframe for
> doing so; 4. THE BIGGIE – how Vertrue gets made whole on the
> million bucks we advanced to Nutzz, LLC. I need to get this in
> front of my management by next week if were going to proceed.
>
> Think of it this way: put your self in my management's shoes.
> You've advanced 1.25MM dollars, which is now gone, What will
> put your mind at ease and motivate you not to fire Carl Peru? A
> well thought out business proposal that gives you the confidence
> that you are now in business with smart, organized, honest people
> who have a realistic plan to get you your million bucks back and
> build a successful long term-business.
>
> Thanks for your help.
>
> Carl

(C-230) (emphasis added). Although it knew of the existence of this email, Vertrue did not

produce it in the Arbitration. In fact, Steven Cowley ("Mr. Cowley") of Edwards Angell, Palmer

& Dodge LLC ("Edward Angell") counsel for Vertrue had the audacity to raise issues as to the e-mail's authenticity at the Arbitration when it was presented to Mr. Peru as part of his questioning. Only as the result of an order out of the U.S. District Court in Connecticut compelling production of responsive documents, did Nutzz receive Vertrue's version of the e-mail. Nutzz had previously received the email during the Arbitration from a third-party (George Blacker).

The Vertrue conspiracy plan to wrest control of Nutzz from Mr. Meshkin in mid-January was not the first time Vertrue sought to extort additional benefits from Nutzz and ultimately steal Nutzz Elite.  As early as December 2004, Vertrue was looking to replace the Gear Box contents; Nutzz hat, can coolie and bumper sticker, with a generic Nextel Cup hat, can coolie and bumper sticker (C-150, VI00918-00919 & VI00923-00925).  At the same time Vertrue was looking to replace the Nutzz Gear Box merchandise with Nextel Cup merchandise, it failed to undertake any marketing efforts on behalf of Nutzz Elite in November or December 2004.  The Agreement in Exhibit B and E clearly indicates that the Gear Box contents were to be provided by Nutzz. The only reasonable explanation for Vertrue's clandestine activities in December 2004 to replace the contents provided by Nutzz; is that Vertrue already had plans underway to breach and sever its Agreement with Nutzz and re-launch as FastTrack Savings.

### D.     Fraudulent Evidence Submitted and Key Evidence Withheld by Vertrue

Vertrue and its counsel Edwards Angell have developed a pattern of deceitful conduct and fraudulent activity in its defense and prosecution of its counter-claims and *Ad Hominem* attacks on Mr. Meshkin. Firstly, Vertrue and its counsel fraudulently fabricated sworn testimony and affidavits that have been submitted and used in multiple courts and the Arbitration to deliberately harm and defame Nutzz and its primary representative Mr. Meshkin (P-10 & P-11).

Secondly, Vertrue and its counsel have withheld key evidence that undoubtedly and irrefutably proves the arbitration claims made by Nutzz. Some of the key evidence that unquestionably validates Claimant's arbitration claims was finally produced following the Arbitration by an Emergency Motion to Compel **Granted** by the U.S. District of Connecticut. The document production is noted by Bates numbers beginning with ("VI") (P-29).

1.     <strong>Purported Eviction of Alexander B. Meshkin from his Residence</strong>

On or before November 4, 2005, Vertrue's counsel, Mr. Cowley of Edwards Angell, initiated an aggressive campaign of lies and deceit against Nutzz and its Chief Executive Officer Mr. Meshkin (P-14 at p. 11 & 12).

The campaign consisted of false representations and fraudulent affidavits provided to the U.S. District Court in Connecticut, the Court of Chancery in the State of Delaware and the Arbitration Tribunal. The implications of personal "eviction" were ultimately orchestrated to place into question Mr. Meshkin's personal integrity and undermine Mr. Meshkin's credibility to the Tribunal during the Arbitration.   During the Arbitration, Mr. Cowley represented Mr. Meshkin had been "evicted" from his residence and Nutzz had been "evicted" from their offices. Both of those accusations were not truthful and had been proven false months earlier with documentation and evidence provided to Edwards Angell, Vertrue and the Courts (P-15 & P-16). However, the false accusations continued against Mr. Meshkin during the Arbitration hearing by Mr. Cowley, placing Mr. Meshkin in the defensive position to deny all the accusations, when questioned by Mr. Cowley and the Tribunal during cross-examination.

Those defamatory statements prejudiced the Tribunal and ultimately led to their denial of Claimants' claims in the Award.

In November 2006, M. Thomas Norwood III, Esq. ("Mr. Norwood") counsel for Mr. Meshkin and Nutzz, for its claims against American Expediting, Inc. ("American Expediting")

and any co-defendants that supported the production of the fraudulent, false and defamatory affidavits; sent a letter to American Expediting (P-9). This letter summarizes the events that led to the production and usage of the affidavits by Vertrue, its counsel Edwards Angell and American Expediting.

For the purpose of this Motion, included are some of the defamatory, false and fraudulent statements made by Mr. Cowley to Claimants' counsel at the time and to the Vice Chancellor, of Court of Chancery in the State of Delaware.

1. On or before November 4, 2005, Mr. Cowley of Edwards Angell initiated an aggressive campaign of fraudulent and false representations to the U.S. District Court in Connecticut and the Court of Chancery in the State of Delaware with the active support of American Expediting.

    a. In a November 4, 2005 correspondence to Vice Chancellor Lamb, of Court of Chancery in the State of Delaware, to support a motion for an expedited hearing for Vertrue's Petition to Appoint a Receiver for Nutzz and Bang Racing LLC ("Bang Racing"), Mr. Cowley of Edwards Angell wrote: (P-14)

        "Alex Meshkin, the sole representative of Nutzz and Bang Racing, is not residing at his last known address, and cannot be located. Nutzz and Bang Racing's counsel refuses to accept legal papers on his behalf or provide a valid residential address where he may be found."

    b. In an email dated November 4, 2005 Mr. Cowley stated to Cozen O'Connor attorneys for Mr. Meshkin at the time: (P-14)

        "More importantly however, you professed no knowledge of, or ability to speak about, the very troubling facts of your clients' seeming disappearance. The companies have been evicted from their offices. Mr. Meshkin, the companies' sole representative, has been evicted from his residence – and your office refuses to accept legal papers on his behalf or provide a valid residential address where he may be found. Mr. Meshkin's mother, the only other person we are aware of with any remaining contacts to the companies, has reported that her address has changed to the former corporate offices from which they were evicted."

In this same email, Mr. Cowley continued his attacks on Mr. Meshkin's character with the support of the fraudulent affidavit and stated "…your clients are acting like deadbeats…"

All of the above accusations are untrue. Mr. Meshkin's attorneys had earlier provided to Mr. Cowley documentation and continued to insist that his address had not changed. Mr. Meshkin had never been evicted from his residence; nor was there any eviction proceeding in place; nor had Nutzz been subject to an eviction.

Mr. Cowley has ignored the truth and has continued his attacks on Mr. Meshkin's personal integrity, business practices and ethics through the support of the false affidavits (P-10 & P-11) produced in association with American Expediting. The false affidavits have caused Mr. Meshkin and Nutzz significant financial harm.

The fraudulent Affidavits of Non-Service (P-10 & P-11) fraudulently fabricated by Edwards Angell in partnership with American Expediting were used to Prejudice the Tribunal.

2.    **Purported Eviction of Nutzz and its Affiliates**

In Respondents Pre-Hearing Arbitration Brief, **Vertrue asserts that Nutzz and its affiliated companies were "evicted" from their offices in January 2005.** On page 11 of Vertrue's Pre-Hearing Brief (P-19), Mr. Cowley falsely states:

"In January 2005, Bang and Nutzz were **evicted** from their business premises at 160 Gasoline Alley in Mooresville, North Carolina."

This assertion is troubling on numerous accounts; not only is this not factual or truthful; it is knowingly false by Vertrue and Vertrue's counsel, Mr. Cowley and Edward Angell. All of the documents produced by Nutzz and a third-party (Jimmy Spencer its landlord) collaborated testimony by Mr. Meshkin that neither Nutzz nor its affiliates were ever evicted from their offices or business premises. To the contrary, the evidence is clear, Nutzz and its affiliates were

compensated before they took leave of their offices; and the rent for that office space had been paid for one (1) month in advance prior to the signing of the Settlement Agreement with Spencer (C-4 & C-5).

This was not the first time Vertrue or its counsel has alleged those fraudulent accusations and defamatory statements against Nutzz and Mr. Meshkin. In an email on November 4, 2005, to David Felice, an attorney for Nutzz, Mr. Cowley states: **"The companies have been evicted from their offices" (P-14 at p.12).**

Those false and defamatory statements were used to support Vertrue's contention that Nutzz was unable to fulfill on its ongoing contractual obligations; and as such, the purported "eviction" excused their breach of Section 19, the Exclusivity Provision of the Agreement and its improper termination. Additionally, Vertrue's counsel, Mr. Cowley of Edward Angell, used this knowingly false assertion to cause Prejudice within the Tribunal towards Mr. Meshkin and the viability of Nutzz.

### 3.    **Vertrue Withheld Key Evidence**

The Tribunal ordered the document production requested by Claimant, Nutzz on April 27, 2006. Documents were produced by Respondent, Vertrue following this order. However, Vertrue withheld vast amounts of crucial documents and evidence that prevented Nutzz from questioning Vertrue employees and witnesses during the Arbitration hearing; the result of which allowed witnesses to be untruthful and thus provide false testimony that the Tribunal entered into evidence and considered in the Award. On June 16, 2006, David Felice, attorney for Nutzz, sent a letter to Vertrue addressing concern about the discovery deficiencies by Respondent (P-7). The Tribunal ultimately decided not to enforce its previous order for the production of documents; and thus prevented Claimant from having a fair opportunity to present its case and prove its claims.

Those documents provided overwhelming and insurmountable evidence that Nutzz Elite and FastTrack Savings were "Substantially Similar." Claim No. 2, of the pleadings filed by Claimant, alleges a breach of the Exclusivity Provision of Section 19 of the Agreement. Vertrue's intentional withholding of documents; ultimately prevented complete and truthful testimony during the Arbitration hearing.

On July 27, 2006, Honorable Peter C. Dorsey, Judge of the U.S. District Court for the District of Connecticut **Granted** an Emergency Motion to Compel documents from Vertrue (P-6). The documents produced by Vertrue (over 1,000 documents) were all printed by Joan Warton, Esquire ("Ms. Warton"), Vice President and Legal Counsel of Vertrue, who was in attendance for the entire Arbitration hearing.

Those documents were clearly responsive in the Arbitration and production ordered by the Tribunal, and was crucial to establishing and proving the Claimant's claims; however, the Tribunal did nothing to enforce its orders and to compel the production of evidence upon request by Claimant. The documents produced by the order of Judge Dorsey are noted with Bates numbers beginning with ("VI") (P-29). Nutzz did not receive the documents produced by this order until on or about August 15, 2006; well after the completion of the Arbitration hearing. This misconduct by Vertrue, Edwards Angell and the Tribunal contributed to the contradictions and discrepancies in the Award; and requires this Court to grant this Motion to Vacate and remand the Claimant's claims to a new arbitral Tribunal.

E.    **Comparison of Nutzz Elite and FastTrack Savings**

Despite the inescapable conclusion that Nutzz Elite and FastTrack Savings were the same program, Vertrue still attempted to argue at the Arbitration that the programs were different and not "Substantially Similar." Vertrue's reluctance to concede this obvious point is for good reason. Nonetheless, the record is clear; Vertrue simply viewed FastTrack Savings as Nutzz

Elite except with a different name. (C-157 ("The creative will use the new name, FastTrack Savings, correct?"); C-158 ("We need to change the product to 'FastTrack Savings,' the new name.").)  Among all the evidence that supports this conclusion are the self-mailers (C-15), that are virtually identical, and the "webbies"(C-213, C-214, C-216, C-217 and C-218), which show that Vertrue simply overwrote the existing tasks for Nutzz Elite (internal group code "NXA"), with those for FastTrack Savings (internal group code "NXA-FastTrack Savings).

The following nine (9) sub-sections compare all key components of a Vertrue provided consumer membership program. The comparison clearly demonstrates that FastTrack Savings was at minimum "Substantially Similar" to Nutzz Elite if not the same:

1.      **The Club Benefits were <u>Identical</u>**

   a)  The Club Benefits of Nutzz Elite that were provided by Vertrue were <u>Identical</u> to FastTrack Savings (VI00940-00942, VI00241-00259, and VI00217-VI00218, VI00610-VI00616 and VI00955-VI00956). The Club Benefits of FastTrack Savings included the exclusive partnership with NASCAR.com that was created exclusively for Nutzz Elite. The only difference between the two programs - FastTrack Savings and Nutzz Elite; was the mere fact that FastTrack Savings members did not get access to the benefits provided through the Free Nutzz Basic Membership.

2.      **Market Positioning**

   a)  FastTrack Savings was a consumer membership program to target NASCAR race fans in an equivalent manner as Nutzz Elite (VI00217-VI00218 and VI00955-VI00956). Vertrue marketed Nutzz Elite to NASCAR fans and to a non-NASCAR specific audience (C-138).

3.      **The Self-Mailers are nearly <u>Identical</u>**

   a)  To further substantiate the fact that FastTrack Savings was the <u>same</u> program as Nutzz Elite, the "Self-Mailers" created by Vertrue for Nutzz Elite and FastTrack Savings were nearly identical. The Self-Mailer was the primary marketing piece used to communicate to new members. The FastTrack Savings Self-Mailer utilized the <u>same</u> creative elements as the Nutzz Elite Self-Mailer including the use of "lug nut" graphics (C-15).

4.      **The Price was Identical**

a)  Nutzz Elite and FastTrack Savings had the same annual membership fee for consumers (C-15). The annual membership price was $79.99.

5.      **The Customer Service Phone Number was the Same**

a)  Nutzz Elite and FastTrack Savings had the same toll-free telephone number (P-23, C-15, C-189, C-190 and C-191).

6.      **Nutzz Elite Landing Pages were used to sell FastTrack Savings Memberships**

a)  Nutzz Elite Landing Pages (Enrollment Pages) were used by Vertrue to enroll FastTrack Savings' members (P-23).

7.      **The Same Product Site was used by Vertrue for Nutzz Elite and FastTrack Savings**

a)  The Product Site for Nutzz Elite and FastTrack Savings was nearly identical. The only change and/or difference were the name and logo (P-23, C-217 and C-218).

8.      **The Domain Name used for the Nutzz Elite Product Site was also used for FastTrack Savings**

a)  Vertrue hosted the FastTrack Savings Product/Benefit website at the same domain name as Nutzz Elite was hosted - ItsNutzz.com. (P-23)

9.      **The Internal Group Code was the Same**

a)  The internal group code at Vertrue identified the membership program for internal tasks and work orders. **The same group code was used for Nutzz Elite and FastTrack Savings.** The group code was NXA (C-213, C-214, C-216, C-217 & C-218).

**F.      Key Evidence Withheld by Vertrue in the Arbitration Confirms Nutzz Elite and FastTrack Savings are "Substantially Similar"**

The evidence presented to the Tribunal during the hearing and the evidence produced by order of the U.S. District Court of Connecticut through an Emergency Motion to Compel (P-6) is overwhelming and insurmountable; and demonstrates that Nutzz Elite and FastTrack Savings are at minimum "Substantially Similar" if not the same.

1. At the latest, in December 2004, unbeknownst to Nutzz, Vertrue was looking to replace the Nutzz.com hat, can coolie and bumper sticker in the Gear Box with generic Nextel Cup merchandise (C-150 & VI00918-00919 & VI00923-00925).

2. On December 7, 2004, Greg Margules of Vertrue received an email from Katie Debnam ("Ms. Debnam") from Action Performance with digital images of the pre-production sample of the Nextel Cup Hat that had been requested by Vertrue in November (VI00918-00919 & VI00923-00925).

3. In December 2004, Vertrue received the actual pre-production sample of the Nextel Cup Hat that was eventually ordered to replace the Nutzz Hat in the Gear Boxes (VI00894-00896). This hat was used on a Co-Branded Landing Page with NASCAR.com ("Landing Page 4" or "LP4") without the authorization or knowledge of Nutzz.com (P-24 & P-23). (Landing Page 4 was never produced by Vertrue in any document production with any litigation with Nutzz.com. Additionally, during the Arbitration Mr. Cowley and Vertrue denied the existence of this enrollment page). Following Vertrue's action in sourcing the Nextel Cup Hat in November and December 2004, Vertrue ultimately replaced the "Nutzz Hat" with the "Nextel Cup Hat" in all Gear Boxes for Nutzz Elite/FastTrack Savings in February 2005 (VER00893-VER00894).

4. On January 10, 2005, Sandra Campos ("Ms. Campos") sent an email to amongst others, Ms. Scarfi and Mr. Peru about "Vendor Feedback" of Nutzz Elite (C-133). Ms. Campos explained in detail the feedback from the vendor: "The vendor has asked if we can possibly change the name in any way so that it is clear that this is a race car fans membership program." Subsequently, Mr. Peru developed the name FastTrack Savings to rename Nutzz Elite.

5. Starting on or before January 12, 2005, Mr. Peru personally had communications with business partners and vendors of Nutzz including Mr. Walters and Chip Williams of the Williams Company of American, Inc., (a company providing marketing services to Nutzz for trackside marketing); about renaming Nutzz Elite and/or the creation of another NASCAR membership program (VI00534-VI00536). In the January 12, 2005 letter from Mr. Walters to Mr. Peru, he states "…unless Vertrue decides to change the name of the NASCAR club and auction it operates now." It continues "Their expertise will transition well with Nutzz.com and they will be able to concentrate on the coming events at Daytona to move forward on items that Vertrue has requested." This seemingly indicates that Mr. Peru was as of January 12, 2005, at the latest sourcing vendors to "transition" and "change the name" of Nutzz Elite.

6.      The Club Benefits of Nutzz Elite that were provided by Vertrue were **Identical** to FastTrack Savings. The Vertrue created "Sell-Sheets" for the two programs are practically identical (VI00217-VI00218 and VI00955-VI00956). The only difference between the two programs- FastTrack Savings and Nutzz Elite was the mere fact that FastTrack Savings members did not get access to the benefits provided through the Free Nutzz Basic Membership.

7.      FastTrack Savings was a consumer membership program to target NASCAR race fans in an equivalent manner as Nutzz Elite (VI00217-VI00218 and VI00955-VI00956). Vertrue marketed Nutzz Elite to NASCAR fans and to a non-NASCAR specific audience (C-138).

8.      To further substantiate the fact that FastTrack Savings is the same program as Nutzz Elite, the "Self-Mailers" created by Vertrue for Nutzz Elite and FastTrack Savings are nearly identical. The Self-Mailer is the primary marketing piece used to communicate to new members. The FastTrack Savings Self-Mailer utilized the same creative elements as the Nutzz Elite Self-Mailer (C-15).

9.      On or before January 27, 2005, a "webby" was placed into the Vertrue "change management software", to create an email: "We need to create a one-time apology email advising all active Nutzz Elite members that their Nutzz Points and Auction are no longer available." The above statement is not true, and implies that Nutzz did not have Nutzz Points and the Nutzz Auction available for the members. This "webby" was later completed on March 22, 2005 and was the "March 24, 2005 FastTrack Savings email" (C-213 and C-170). It is uncontested that as of January 27, 2005, Nutzz Points and the Nutzz Auction were available to all Basic and Elite Members.

10.     On or before February 1, 2005, Vertrue ceased technical operations as required per Section 2.e.ii of the Agreement; thereby ending its relationship with Nutzz and ceasing to perform its contractual obligations. **The actions taken by Vertrue on February 2, 2005, clearly demonstrate Vertrue had no intention to fulfill its contractual obligations.** It is undisputed that on February 1, 2005 and at all times prior following the launch on November 17, 2004, Nutzz.com and Nutzz Elite were operational and available to the public. This continued to hold true through February 10, 2005, the date in which Vertrue sent the termination letter to Nutzz (C-159).

a)  On February 1, 2005, Mr. Fridrich emailed Ms. Scarfi and stated: (C-153 & C-216)

**As we discussed I have disabled all of jobs that sent Nutzz.com member data.** However, we still have in place

the pixel on LP1. Do you want this disabled as well? Also, the jobs we disabled today will no impact the enrollment process.

    b)  On February 1, 2005, Ms. Scarfi responded: (C-153 & C-216)

Please disable the LP1…can we redirect to LP2?

11.    On or before February 2, 2005, Mr. Peru communicated to Kip Finch ("Mr. Finch") Vice President, Creative Services of Vertrue about the design of the FastTrack Savings logo (VI00920 & C-214). Mr. Peru stated in this email "Also, we should look at one execution that is "inspired" by the NASCAR logo itself, which we can run by Legal to see if we're too close for comfort." (VI00920) Mr. Peru wanted the FastTrack Savings logo to appeal to NASCAR race fans and if possible, closely resemble the NASCAR logo itself. **This unquestionably demonstrates that FastTrack Savings was intended to appeal to fans in the field of motorsports.**

12.    On February 3, 2005, Mr. Peru traveled to Charlotte, North Carolina to meet with representatives involved with NASCAR and representatives of Joint Marketing Group (a company owned by Cameron Tousi, John Adalio and John Walters to supplant the Agreement between Nutzz and Vertrue) to develop partnerships for FastTrack Savings (VI00583-VI00587). During this trip Mr. Peru met with Derrike Cope ("Mr. Cope"), a NASCAR driver and team owner. Even though Nutzz was headquartered in the Charlotte area and Mr. Meshkin resided nearby; Mr. Peru made no attempt to contact him or set-up a meeting. As of January 31, 2005, Mr. Meshkin was waiting for a date and time to meet with Mr. Peru and his management (C-149 & P-21).

13.    On February 6, 2005, Mr. Peru had a conference call with Cameron Tousi about the partnership between Joint Marketing Group and Vertrue to support FastTrack Savings (VI00222).

14.    On February 8, 2005, Mr. Peru emailed Heath Grayson ("Mr. Grayson"), Vice President and Sr. Counsel of Vertrue (**VI00943-VI00951). Mr. Peru contacted Mr. Grayson to draft an agreement between Joint Marketing Group and Vertrue, based upon the February 2, 2005 letter to Mr. Duffy (VI00136-VI00142).** This is undisputable evidence that Vertrue was developing an agreement with another party to supplant Nutzz, which is a clear violation and material breach of Section 19 of the Agreement. The agreement with Joint Marketing Group was a partnership that would provide Vertrue with an alternate route to earn back the advance paid to Nutzz and would provide marketing services with revenue sharing for "Fast Track Savings," the new name for Nutzz Elite. **The**

undisputable statement by Mr. Peru: **"The Nutzz program will be called "Fast Track Savings. I'd like to adapt the Nutzz agreement into a new agreement with these guys."** Clearly, demonstrates Vertrue's intentions and motives prior to the purported termination of the Agreement with Nutzz (VI00943-VI00951).

a)  Mr. Meshkin and Nutzz were unaware of those conversations and contracts being developed. Janet Cassin ("Ms. Cassin") Legal Secretary to Mr. Grayson responded to Mr. Peru and copied his supervisor, Mr. Weiss. In this email, Ms. Cassin sent a Contract Request Form for Mr. Peru to complete (VI00943-VI00951).

15.     On February 8, 2005, Mr. Peru emailed Mr. Tousi to inform him that **"My boss (Mr. Weiss) just approved the contract request for Joint Marketing, so our Legal staff will begin putting the agreement together" (VI00219).** This was two (2) days prior to the notice of termination sent by Vertrue.

16.     On February 11, 2005, Mr. Tousi sent Mr. Peru a **"Sample Agreement Provisions"** for the agreement being drafted by Vertrue (VI00216 & VI00128 – VI00132). Mr. Peru informed Mr. Tousi, Mr. Adalio and Mr. Walters that "We just sent our official notice of termination to Alex yesterday."

17.     On or before February 17, 2005, Vertrue sought to destroy all Nutzz Elite "Gearboxes"; along with their contents; except for some samples.  **On February 20, 2005, the request to destroy the inventory for Nutzz Elite "Gearboxes" was approved (VI00340-VI00344).** The request and actions to destroy Nutzz Elite inventory were within 10 days following the Termination letter sent to Nutzz.com (C-159). Clearly, Vertrue did not intend to provide Nutzz with a thirty (30) day cure period (C-1 at § 1)

18.     On February 22, 2005, Ms. Scarfi received the newly designed FastTrack Savings logo (VI00959-VI00962).   The file name of the FastTrack Savings logo attachment begins with "NXA." As part of the same email string, (VI00961) Heather Coppola ("Ms. Coppola") of Vertrue emailed Target about approvals. In this email Ms. Coppola stated: "We have recently added Target to our new FastTrack program. We changed the logo and name from Nutzz Elite to FastTrack Savings, which will allow us to reach a broader audience which included both targeted NASCAR fans and a more general audience."

19.     On March 2, 2005, Mr. Tousi and Mr. Cope met with Mr. Weiss, Mr. Duffy and Mr. Peru at Vertrue's corporate offices (VI00179 & C-162).

20.     On March 3, 2005, Mr. Peru emailed Mr. Cope and Mr. Tousi and informed them that George Thomas, SVP and General Counsel of Vertrue

("Mr. Thomas") and Mr. Duffy "has instructed him (Mr. Thomas) to start putting the agreement together" (VI00769).

21.     On March 15, 2004, Jennifer Deloge ("Ms. Deloge") of Vertrue informed two employees of Vertrue that: "Correct, we just want to contact the active members to alert them to the name change, URL etc" (VI00938-VI00939).

22.     On March 24, an email titled "Nutzz Elite Name Changes to FastTrack Savings…" (C-170 & C-213)

23.     On April 5, 2005, Ms. Coppola with Vertrue's Partner Marketing and Development group sent an email to all of the Partners/Benefit Providers in the Nutzz Elite program. She stated that there was a name change for Nutzz Elite and that this name change was due to marketing research. She emphasized the point that since "they" the Benefit Providers had already approved their participation in the Nutzz Elite program; there would be no need for further approvals, since FastTrack Savings was merely a name and logo change from Nutzz Elite (C-171). The email below from Ms. Coppola was titled, "Nutzz Elite to FastTrack Savings":

**"We have experienced some revisions to our recently launched Nutzz Elite program. Our initial testing unearthed that the name Nutzz was confusion in the marketplace and that NASCAR enthusiasts weren't marketing the connection that this was a NASCAR themed program.    Further research found that FastTrack Savings had more of an impact for race car enthusiasts. Since you have approved the participation of the Nutzz Elite program, we just wanted to bring this chance to your attention and mention there is no change in the copy, logo or image used in the program."**

24.     **On April 6, 2005, Ms. Scarfi received the FastTrack Savings Benefit Grid.** The file was named NXA Benefit Grid 12-04.xls (VI00940-00942). This file clearly documents that the club benefits of both **Nutzz Elite and FastTrack Savings were Identical** and the list of Benefit Providers had not changed since December 2004 when the program was named Nutzz Elite.

The file name that was attached to the email was titled, "NXA Benefit Savings Grid 12-04.xls." The NXA was the internal group code for the Nutzz Elite Program; which also became the internal group code for FastTrack Savings. This is an undisputed fact that is supported by considerable evidence.  **This document illustrates and surpasses any measure of the burden of proof required to document that the benefits of FastTrack Savings and Nutzz Elite were <u>Identical</u>.**

25.    On April 12, 2005, Ms. Deloge confirmed that Vertrue sent 1,493 emails on March 23, 2005 and that there were about 4,500 active Nutzz Elite members at the time (VI00926 & C-170).

26.    In May 2005, following Nutzz filing a lawsuit in the Court of Chancery of The State of Delaware, Vertrue ceased to actively market FastTrack Savings.

27.    On July 8, 2005, Dennis Fridrich ("Mr. Fridrich"), Director of Information Systems, enrolled for FastTrack Savings and received an email confirmation which stated:

**"Welcome to FastTrack Savings $^{SM}$ – and congratulations!**

**Your Official Nutzz Gear Box will arrive in the mail soon. Inside will be your membership information and your officially-licensed racing merchandise, including a racing cap, can coolie, stickers and more!" (C-226)** This email was not produced by Vertrue in the Arbitration or through any document production in any related litigation. Mr. Fridrich produced this email independently following intense questioning at a deposition. Nevertheless, the email was still not produced until July 23, 2006. Clearly, this email was responsive to numerous document requests by Nutzz and Mr. Meshkin)).

**This is irrefutable; and clear and convincing evidence, that FastTrack Savings is nothing more than Nutzz Elite re-branded; to simply exclude Nutzz.**

28.    **On July 25, 2006, Mary Ann Meshkin ("Ms. Meshkin") registered for Nutzz Elite through Landing Page 4 and received instead, a FastTrack Savings Membership (P-23).** This Landing Page, which was co-branded with NASCAR.com (Time Warner), was never previously disclosed by Vertrue and remained secret even after the Motion to Compel in federal court. To date, Vertrue has never acknowledged the existence of this enrollment/landing page or the members derived through this distribution outlet and enrollment page.

It is blatantly apparent from the additional documents produced after the Arbitration hearing had come to an end and subsequent to the order by the U.S. District Court (P-6); that Vertrue had developed unbeknownst to Nutzz; this co-branded version of Nutzz Elite with NASCAR.com, all prior to the launch of Nutzz Elite. In an email dated November 19, 2005, from Mr. Margules of Vertrue, bullet point (10) states: "NASCAR.com Superstore-Working with Mary Wong to finish the template, create the kit

and then we push the page live." In this email, Mr. Margules refers to the "kit." This unauthorized "kit" is the Gear Box with the Nextel Cup hat replacing the hat, which Nutzz had provided (VI00904-VI00917). This email is the earliest documentation demonstrating Vertrue conspiring to undermine Nutzz in its participation with Nutzz Elite.

(Vertrue has never produced any communications, agreements or any documents pertaining to the relationship with NASCAR.com and Nutzz Elite or FastTrack Savings. Additionally, Vertrue has not disclosed the list of members that enrolled through this landing page).

**G.      Carl Peru's Affidavit**

Mr. Peru is the former Vice President of Product Marketing for Vertrue and as Vice President for Vertrue; managed the development and creation of Nutzz Elite and FastTrack Savings.

Mr. Peru testified "live" at the Arbitration hearing without a written witness statement. Mr. Peru has confirmed that all of the statements in the attached Affidavit are truthful. However, because he is fearful of Vertrue and their counsel, he is unwilling to sign the Affidavit because of his Separation Agreement with Vertrue (P-22).

Mr. Peru's legal counsel has advised him that signing any affidavit could be in violation of his Separation Agreement with Vertrue (P-22). Mr. Peru and Mr. Meshkin have exchanged emails during the month of December 2006 about the attached affidavit (P-20 & P-21). Below is the last email received from Mr. Peru regarding the attached Affidavit.

Alex:

I have had a chance to review the situation with my attorney. I have been advised not to sign any affidavit. It appears that to do so would be in violation of my separation agreement with Vertrue.

Carl

The Peru Affidavit is attached as an exhibit and can be validated through subpoena and deposition or through live testimony.

### H.     Vertrue's Financial Forecast and Expectations

In early August, Ms. Scarfi, Director of Product Development of Vertrue, conducted research and analysis to develop projections for "Nutzz Sales." On August 20 2004, Ms. Scarfi developed projections that were sent to Finance and to Jim Frey to manage inventory (C-39). The projections were for 2004 and they are as follows: September (5,000), October (10,000), November (10,000) and December (10,000). Those projections were based upon the assumption that Nutzz Elite were going to launch in mid-September and maximize the eBay banner advertisements provided by Nutzz to "sell" Nutzz Elite.

On October 18, 2004, following several Vertrue delays in the scheduled launch, Ms. Scarfi notified Finance that the sales forecast had changed for the remainder of 2004 and early 2005 (C-83). Ms. Scarfi now projected sales in 2004 to be far below the original projections in August because of the uncertainty of the launch date. The revised projections are as follows: November (1,000), December (2,000), January (2,000) and February (5,000). The reason the projections significantly increased in February are two fold:

> (i)     Firstly, according to Vertrue, direct marketing programs at Vertrue performed better in February and the months following than in November and December because of the holiday season.

> (ii)     Secondly, the NASCAR race season begins in mid-February and ends in November. Because of the delays of the launch of Nutzz Elite, Nutzz was not going to be able to market trackside until 2005. In October 2004, Vertrue's projections were for during the NASCAR race season; Nutzz Elite "sales" were going to be 5,000 per month.

It is without question; using the above Vertrue forecasts, projections and expectations for the Initial Term of the Agreement; Nutzz Elite would have generated more than $40 Million in membership revenue for the Parties.

Per the Agreement, the membership fees that would have been entitled to Nutzz were more than $12 Million.

III.    **THE TRIBUNAL'S FINDINGS AND MISCONDUCT CONSITUTE GROUNDS FOR VACATING AND REMANDING THE AWARD**

The Tribunal's Award was deeply flawed in at least four respects. Firstly, the Tribunal failed to adhere to the Agreement's Termination Provision. The Tribunal was deficient; and did not determine if the Respondent used the correct and proper termination procedure in accordance with the Agreement's protocol. The Tribunal's disregard for the proper termination procedure; is a disregard of the law and Agreement; and points to their exceeding powers and the inaccuracy of the Award.  Secondly, the Tribunal manifestly disregarded their previous order for document production; and did not compel the production at the request of the Claimant; and allowed the Respondent to avoid the production of key evidence; that would have, without question, provided overwhelming and irrefutable evidence to the claims of the Claimant. Thirdly, the Tribunal completely failed to consider and thus to hear the uncontested and irrefutable evidence produced following the Arbitration (by Order of the U.S. District Court), on one of the most important questions - "Was FastTrack Savings *Substantially Similar* to Nutzz Elite?" Fourthly, the Tribunal's misconduct, evident partiality and selective use of evidence is alarming. On one hand, the Tribunal denied Respondent's claims and then on the other hand, denied Claimant's claims with the use of different and selective evidence, which was unsubstantiated and contradictory to the overwhelming evidence and evidence used to deny Respondent's Claims.

Under well-established principles of U.S. arbitration law, these fundamental deficiencies and misconduct constitute arbitral misconduct, rendering the Award contradictory and incomplete, and requires that this Court vacate the Award.

### A.    The Tribunal's Failure to Adhere to the Agreement's Termination Provision

The Tribunal's disregard of the Agreement and its exclusivity requirements with Nutzz; and to refrain from servicing competing programs is grounds for vacating the Award.

> During the Initial Term or any Renewal term of this Agreement, neither Party, nor any of its affiliates or subsidiaries, shall purchase, market, administer, or <u>enter into an agreement with another party, written or unwritten</u>, permitting such other party to market, offer, sell, or otherwise make available programs, clubs, services or products which are <u>substantially similar</u> to the Club being offered by [Vertrue] and Nutzz pursuant to this Agreement. In particular, during initial Term or any Renewal Term of this Agreement, neither [Vertrue] nor any of its affiliates or subsidiaries, shall purchase, market, administer, or enter into any agreement with another party, written or unwritten, <u>permitting such other party to market</u>, offer, sell, or otherwise make available <u>to [Vertrue] Members</u> or prospective Members, <u>the program contemplated by this Agreement in the field of motorsports</u>.

(C-1 at § 19) (emphasis added).  **Vertrue breached the clear and unambiguous language of this provision by: (i) agreeing on February 8, 2005 to enter into a contract relationship with Joint Marketing Group to offer the FastTrack Savings Program (VI00943-VI00951);** (ii) negotiating with Williams and Derrick Cope to provide trackside marketing and motorsports content to offer to Vertrue's "prospective members" of the FastTrack Savings Program; (iii) **undertaking the development of the FastTrack Savings program before issuing an effective notice of termination and/or providing an opportunity to cure under the Agreement; and (iv) offering and marketing the FastTrack Savings Program.**

Based on Vertrue's multiple breaches of this provision, Nutzz is clearly entitled to compensatory damages in the form of its expectation damages.

The Tribunal clearly disregarded the Agreement in their denial of Claimant's claims; however upheld the Agreement in the denial of Respondent's claims. This is clearly arbitral misconduct and the result is contradictory Award.

**B.      The Tribunal's Failure to Hear and Consider the Evidence that FastTrack Savings was "Substantially Similar" to Nutzz Elite**

It is evident that the Tribunal failed to hear and consider the evidence produced by Vertrue that unquestionably documents FastTrack Savings and Nutzz Elite are "Substantially Similar." This unique circumstance presents this Court with overwhelming evidence that illustrates gross negligence; and shows the Tribunal failed to review the credible evidence which, irrefutably would have validated that the programs; Nutzz Elite and FastTrack Savings were "Substantially Similar," and even the "same." As the Award currently stands, it is incomprehensible, unexplainable and contradictory; and requires this Court to vacate the Award.

**C.      The Misconduct of the Tribunal Tribunal to Refuse and Prevent Claimants' Counsel to Question Witnesses and the Tribunal's Misrepresentation of Factual Understandings**

During the Arbitration hearing, the Chairman of the Tribunal (John F. Byrne, Esquire) prevented Claimant's counsel from questioning opposing witnesses about the substantial similarities of Nutzz Elite and FastTrack Savings. During the cross-examination of the second witness an employee of the Respondent (Maurice Musilli, Vice President); and following a sequence of questions by Claimant's counsel about the substantial similarities of Nutzz Elite and FastTrack Savings; the Chairman of the Tribunal stopped the questioning and prohibited further questioning by the Claimant's counsel for the current and all future witnesses on the topic of substantial similarities of FastTrack Savings and Nutzz Elite and he stated, **"We Get It."** This is

troubling for several reasons; (i) the Chairman expressed his opinion using "plurality" and did not consult with other members of the Tribunal before making the statement; (ii) in Section 19 of the Agreement, the Exclusivity Provision prevents either Party from creating, developing or marketing a "Substantially Similar" program. By prohibiting Claimant's counsel from utilizing the phase "Substantially Similar"; the same phase used in the Agreement to describe prohibited activity; was clearly partiality, and unfair to the Claimant (iii) and most importantly, the Tribunal in their Award, utilized the phase "Substantially Similar" in their denial of Claimant's Claims.

### D.     The Tribunal's Failure to Enforce Discovery Orders

The Tribunal failed to uphold the integrity of the arbitration process and violated their orders set forth in the pre-hearing conference. This subsequently inhibited Nutzz from presenting its case; having available evidence in the control of Respondent, Vertrue.  The fraudulent actions by the Respondent and misconduct by the Tribunal and the disregard for fairness and partiality is grounds for this Court to vacate the Award.

### E.     The Tribunal's Partiality to Allow Respondent to Submit Witness Statements from Witnesses after the Hearing Days Had Concluded

The Tribunal unlawfully violated its previous orders at the conclusion of the Arbitration hearing; and permitted Respondent to submit a witness statement from a witness that was not on either Parties witness list nor requested by the Tribunal. On Friday August 25, 2006, Vertrue sent the Panel via email a copy of the witness statement of Denise Gaudet Kopchick ("Kopchick Witness Statement").

Nutzz articulated its position and objection to the Kopchick Witness Statement with correspondence to the Tribunal. On September 1, 2006, counsel for Nutzz forwarded a letter objecting the admittance of the Kopchick Witness Statement into evidence.  Ms. Gaudet Kopchick was not on Vertrue's witness list, and the Kopchick Witness Statement was the first

time Nutzz or its counsel had heard her name (P-8). In September, the Tribunal issued their order and allowed the Kopchick Witness Statement into evidence. The order by the Tribunal shows evident Partiality.

## IV.    UNDER U.S. LAW THE AWARD SHOULD BE VACATED AND REMANDED TO A NEW TRIBUNAL.

The evidence presented in this Motion clearly shows arbitral misconduct. In addition to the misconduct by the Tribunal, the Respondent clearly defrauded the Tribunal and the arbitral process, which contributed to the vast inconsistencies and contradictions in the Award. Under U.S. law, misconduct requires that this Court vacate the Award.

### A.    Governing Law: The Federal Arbitration Act (FAA)

Section 10 of the Federal Arbitration Act (FAA) sets out the statutory grounds for vacating an arbitration award. At a minimum, the following grounds of the FAA are relevant here:

> (3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

> (4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.[1]

FAA case law also recognizes that an award may be vacated if the arbitrators act in "manifest disregard of the law." The "manifest disregard of the law" concept, while not set forth

---

[1] 9 U.S.C. § 10.

in the FAA, is widely accepted as a ground for vacating arbitration awards.[2] The D.C. Circuit held that "to modify or vacate an award on this ground, a court must find that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case."[3] Similarly, the U.S. District Court for the Eastern District of Pennsylvania held that "'[m]anifest disregard of the law' encompasses situations in which it is evident from the record that the arbitrator recognized the applicable law, yet chose to ignore it."[4]

One of the purposes of the "mutual, definite, and final" ground in § 10(a)(4) is to ensure the completeness of arbitration proceedings. "An award is mutual, definite and final if it 'resolve[s] all issues submitted to arbitration, and determine[s] each issue fully so that no further litigation is necessary to finalize the obligations of the parties."[5] Similarly, the purpose of the "imperfectly executed" ground is "to render unenforceable an arbitration award that is either incomplete in the sense that the arbitrators did not complete their assignment (though they thought they had) or so badly drafted that the party against whom the award runs doesn't know how to comply with it."[6]

U.S. courts also routinely refuse to enforce awards that are found to be contradictory, primarily because such awards cannot be considered "mutual, final, and definite."[7]

---

[2] *See, e.g., Brabham v. A.G. Edwards & Sons Inc.*, 376 F.3d 377, 381 (5th Cir. 2004) ("[M]anifest disregard is an accepted nonstatutory ground for vacatur."); *Montes v. Shearson Lehman Bros., Inc.*, 128 F.3d 1456, 1460 (11th Cir. 1997) ("[E]very other circuit . . . has expressly recognized that 'manifest disregard of the law' is an appropriate reason to review and vacate an arbitration panel's decision.").

[3] *LaPrade v. Kidder, Peabody & Co., Inc.*, 246 F.3d 702, 706 (D.C. Cir. 2001).

[4] *Jeffrey M. Brown Assocs., Inc. v. Allstar Drywall & Acoustics, Inc.*, 195 F. Supp.2d 681, 684 (E.D. Pa. 2002); *Montes v. Shearson Lehman Bros., Inc.*, 128 F.3d 1456, 1461 (11th Cir. 1997) ("To manifestly disregard the law, one must be conscious of the law and deliberately ignore it.").

[5] *ConnTech Dev. Co. v. Univ. of Conn. Educ. Props., Inc.*, 102 F.3d 677, 686 (2d Cir. 1996); *Michaels v. Mariforum Shipping, S.A.*, 624 F.2d 411, 413-14 (2d Cir. 1980) (same).

[6] *Smart v. Int'l Bhd. of Elec. Workers, Local 702*, 315 F.3d 721, 725 (7th Cir. 2002).

[7] 9 U.S.C. § 10(a)(4); *Sheet Metal Workers Int'l Ass'n Local Union No. 420 v. Kinney Air Conditioning Co.*, 756 F.2d 742, 745 (9th Cir. 1985) ("Courts will not enforce an award that is incomplete, ambiguous, or contradictory."); *Dworkin-Cosell Interair Courier Servs., Inc. v. Avraham*, 728 F. Supp. 156, 161-62 (S.D.N.Y. 1989) ("[I]t is well established under the [FAA] that "[c]ourts will not enforce an award that is incomplete, ambiguous or contradictory.'"); *Sea Dragon, Inc. v. Gebr. Van Weelde Scheepvaartkantoor B.V.*, 574 F. Supp. 367, 371 (S.D.N.Y.

For example, the Second Circuit remanded an award to arbitration where it was found to be "contradictory on its face."[8] The arbitration was supposed to determine which one of two unions would be responsible for a certain job category at a factory, but the award seemed to assign the job category to both unions. The Second Circuit emphasized that "[t]he purpose of arbitration is to resolve disputes, not to create new ones [;] [and] [a]n award which does not fulfill this purpose is unacceptable."[9] The court found that the award failed this test because it was impossible to determine what the arbitrators had decided.

U.S. courts have the power to remand incomplete, ambiguous, or contradictory awards.[10] For example, the U.S. District Court for the District of Columbia held that remand is appropriate where "the award is incomplete or ambiguous."[11] The court emphasized that "[a]n ambiguous award should be sent back to the arbitrator so the court 'know[s] exactly what it is being asked to enforce."[12]

In remanding arbitration awards, U.S. courts have the power to determine whether to remand to the original arbitrators or to new arbitrators.[13] In considering the propriety of a district

1983) ("Courts will not enforce an award that is incomplete, ambiguous or contradictory."); *United Mine Workers of Am. v. Dickenson County Med. Ctr.*, No. 1:00cv00078, 2001 WL 420374, at *5 (W.D. Va. Mar. 20, 2001) ("It is well-settled that a court cannot enforce an arbitration award that is 'incomplete, ambiguous, or contradictory.'")

[8] *Bell Aerospace Co. Div. of Textron v. Local 516, Int'l, et al.*, 500 F.2d 921, 924-25 (2d Cir. 1974).

[9] *Id.*

[10] A Canadian court partially set aside and remitted for reconsideration a NAFTA Chapter 11 arbitration award in *The United Mexican States v. Metalclad Corp.* (2001), 89 B.C.L.R. (3d) 359 (S.C.), 2001 BCSC 664. The Supreme Court of British Columbia found that the arbitral tribunal in the *Metalclad* dispute had "misstated the applicable law" on the minimum standard of treatment, and "then made its decision" on that basis. The court also found that the tribunal's misstatement of the governing law "infected," and thus undermined, the tribunal's analysis of the expropriation question. The court set aside the tribunal's holdings on these two issues, and remitted the dispute to the tribunal to correctly address the outstanding questions. The dispute was settled before the tribunal reviewed the matter further.

[11] *Office and Prof'l Employees Int'l Union, Local 2 v. Washington Metro. Area Transit Auth.*, Civ. A. No. 89-1264(OG), 1990 WL 174892, at *2-3 (D.D.C. Oct 25, 1990).

[12] Id.

[13] *Forsythe Int'l, S.A. v. Gibbs Oil Co. of Texas*, 915 F.2d 1017, 1020 (5th Cir. 1990) (discussing the district court's power to "nullif[y] the decision of an arbitration panel . . . [and] remand[] the case to a different arbitration panel"); *Grand Rapids Die Casting Corp. v. Local Union No. 159, United Auto., Aerospace and Agr. Implement Workers of Am., UAW*, 684 F.2d 413, 416 (6th Cir. 1982) ("We suggest to the District Court that remand should be to a different arbitrator."); *Hart v. Overseas Nat'l Airways, Inc.*, 541 F.2d 386, 393-94 (3d Cir. 1976) ("If after such review the district court finds no bias on the part of the referee as would affect liability and that the proceedings before the referee were otherwise full and fair, there would seem to be no barrier to affirming the referee's liability finding and

court's order remanding a dispute to a new arbitrator, the Sixth Circuit emphasized that "district courts are usually afforded broad discretion in fashioning appropriate relief," and that discretion includes the power to appoint new arbitrators.[14] Importantly, the Sixth Circuit rejected the appellant's argument that "remand to a new arbitrator is appropriate only where an arbitrator's actions compromise the appearance of impartiality," as well as the argument that "remanding to a new arbitrator produce[d] an unneeded inefficiency, because the former arbitrator [was] already familiar with the merits of the case."[15] Similarly, the Southern District of New York held that "[a]lthough not explicit in the FAA, it is within this Court's discretion to remand a matter to the same arbitration panel or a new one."[16]

The Tribunal manifestly disregarded the principle of law that it hear and fairly consider unchallenged, uncontested, clear and uncorroborated evidence.[17] Because the Tribunal effectively excluded and failed to hear and consider the critical evidence concerning Nutzz Elite and FastTrack Savings being "Substantially Similar," it engaged in arbitral misconduct. Additionally, because the Tribunal did not follow their own orders outlined in the Pre-Conference and adhere to their imposed rules regarding evidence; even after requesting the

remanding only for the computation of damages. In the event, however, that a defect in the proceedings or bias on the part of the referee is found by the district court, the district court should formulate an appropriate remedy to provide for the resolution of the parties' differences by arbitration, including, if necessary, a procedure whereby a new arbitrator is selected."); *Erving v. Va. Squires Basketball Club*, 468 F.2d 1064 (2d Cir. 1972) (holding that district court judge properly appointed neutral arbitrator to replace designated arbitrator).

[14] Aircraft *Braking Systems Corp. v. Local 856, Int'l Union, United Auto., Aerospace and Agr. Implement Workers, UAW*, 97 F.3d 155, 162-63 (6th Cir. 1996) (citations omitted).

[15] *Id.*

[16] *Matter of Arbitration Between Tempo Shain Corp. v. Bertek, Inc. No. 96 Civ. 3354 (LAP), 1997 WL 580775 (S.D.N.Y. 1997)*

[17] *See Hoteles Condado Beach v. Local 901*, 763 F.2d at 40 (holding that vacatur is appropriate when the arbitrators' "refusal to hear pertinent and material evidence prejudices the rights of the parties to the arbitration proceedings," or "when the exclusion of relevant evidence 'so affects the rights of a party that it may be said that he was deprived of a fair hearing;" and holding that an arbitrator's refusal to give any weight to testimony contained in a trial transcript "effectively denied [the appellee] an opportunity to present any evidence in the arbitration proceeding" because "[t]he testimony was unquestionably relevant" to a critical question of fact, and "no other evidence was available" on this issue); *see also Karaha Bodas, Co. L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 364 F.3d at 300-01.* ("It is appropriate to vacate an arbitral award if the exclusion of relevant evidence deprives a party of a fair hearing.").

Tribunals intervention to demand the evidence held by Vertrue, Nutzz was not able to effectively execute their case. Because the Tribunal manifestly disregarded controlling principles of law, the Award should be vacated.

### B.     The Award is Contradictory

The Award was contradictory on its face. The Tribunal failed to apply the same evidence and legal standards to reach conclusions on both Claimant's and Respondent's Claims and Counter-Claims. The evidence cited and conclusions reached by the Tribunal that denied Respondent's Claims were not applied to the Claimant. In fact, the evidence was willfully ignored by the Tribunal, seemingly to prevent an award supportive of Claimant. The credible evidence is overwhelming and clearly substantiates the Claimant's claims; the evidence compounded with the Tribunal's conclusions and statements in the Award are grossly contradictory.

On one hand, the Tribunal wrote in response and denial to Claimant's second claim.

> 1.     Claim No. 2, alleging breach of the exclusivity provisions of Section 19 of the Agreement, must fail because (a) there was no evidence that Vertrue was developing FastTrack Savings until late January 2005 when it had given up on Claimant (b) Vertrue had every right to develop and market FastTrack Savings after the Agreement was terminated; (c) the credible evidence failed to establish that Nutzz Elite and FastTrack Savings were "substantially similar" membership programs.

The above conclusions are inherently flawed and prejudiced. On the one hand the Tribunal acknowledges that Respondent was developing FastTrack Savings in late January 2005 and provides further explanation of their findings, stating "when it had given up on Claimant." The Agreement does not provide either Party with a remedy and/or ability to give up on the other Party. The Tribunal's explanations and statements are troubling and questionable; and

undeniably contradictory to the evidence and Agreement; and clearly show evident partially. This willful misconduct and manifest disregard of the law, Agreement and key credible evidence; requires this Court to vacate the Award and remand it to a new Tribunal.

Additionally, in Section 1(b) of the Agreement, it clearly states that a written notice of termination must be sent prior to either party terminating the Agreement. As described in Section II (B)(1) of this Motion, Vertrue did not provide the proper notice of termination or terminate the Agreement in accordance with the Agreement.

On the other hand, the Tribunal wrote in response and denial to Respondents first claim:

> 2.    There are at least two (2) significant problems with Vertrue's reliance on alleged breach of Section 2(a), however.  First, the work schedule, specifications and division of labor agreed to, established or acquiesced in <u>after</u> the Agreement was executed served to modify both parties' obligations and timing of performance. Second, the credible evidence is replete with examples of Vertrue employees continuing to work with Nutzz.com to get the program up and running throughout 2004 – well after the October 14th "deadline". Nonetheless, Vertrue sat on its "rights" until February 2005 before it decided to pull the plug on the Agreement and Nutzz Elite (assuming, of course, that the "defaults" in performance could not be cured within the period prescribed in an **effective notice of termination** pursuant to Section 1(b) of the Agreement). Moreover, the credible evidence provided numerous examples of how Vertrue contributed to the ultimate demise of Nutzz Elite, including the miscommunication among its own employees, miscommunication between Vertrue and Nutzz personnel, technical deficiencies in the design and implementation of the programming, lack of a coordinated effort and the like.

In the above section, it is clear that the Tribunal understood the termination provision in Section 1(b) of the Agreement but failed to enforce the law and Agreement; in that Vertrue was required to send an ***effective notice of termination*** as described in Section 1(b) of the Agreement.

41

Additionally, the Tribunal represents that "there was no evidence that Vertrue was developing FastTrack Savings until late January 2005…" This assertion totally disregards Mr. Peru's live Arbitration testimony. Furthermore, Mr. Peru's attached Affidavit (P-21) clearly documents the development of a replacement program for Nutzz Elite (FastTrack Savings) beginning in early January at the latest. This Affidavit includes evidence withheld by Vertrue during the Arbitration and therefore unavailable for Mr. Peru or any other witness to review. However, in fact, Mr. Peru testified at the Arbitration that the creation of Fast Track Savings began, at the latest, in mid-January. The below section of the Affidavit provides credible testimony and evidence that plans for FastTrack Savings began on or before January 10, 2005.

> 3.     On January 10, 2005, Sandra Campos ("Ms. Campos") sent an email to amongst others, Ms. Scarfi and me about "Vendor Feedback" of Nutzz Elite (C-133). Ms. Campos explains in detail the feedback from the vendor, and I will quote: "The vendor has asked if we can possibly change the name in any way so that it is clear that this is a race car fans membership program." Subsequently, I developed the name FastTrack Savings to rename Nutzz Elite.

Subsequently, the Tribunal stated the credible evidence failed to establish that Nutzz Elite and FastTrack Savings were "Substantially Similar" membership programs. This conclusion is incomprehensible and shows evident partiality and misconduct that is irrefutable by the evidence provided during the Arbitration and by the Emergency Motion to Compel by the U.S. District Court of Connecticut (P-6). Section II(F) of this Motion, unquestionably and irrefutable proves that FastTrack Savings and Nutzz Elite are at minimum "Substantially Similar."

### C.     The Award is Incomplete

The Award is incomplete; the Tribunal failed to fairly and properly review the existing evidence on Nutzz's claims relating to the proper termination of the Agreement and the breach of the exclusivity provision. It ignored or overlooked all the relevant evidence produced through an Emergency Motion to Compel granted by the U.S. District Court of Connecticut (P-6). The Award is incomplete because there was never a fair and impartial adjudication of the evidence for the Claimant's claims.

In rendering an incomplete Award, and subsequently refusing to remedy its misconduct, the Tribunal engaged in substantial misbehavior by which the rights of Nutzz have been prejudiced.

### D.     This Court Should Remand to a New Tribunal

The Tribunal's misconduct and misbehavior cannot be remedied by remanding to the original group of Arbitrators. Nutzz has asserted that the Tribunal is guilty of misconduct, including an absence of prejudice. If this case is remanded to the same Tribunal, Nutzz will not obtain a fair and impartial review, any more than they did in 2006, and will surely not obtain justice.

### E.     Conclusion

There are two (2) primary causes for incomprehensible and inconceivable Award. Firstly, Vertrue and its counsel clearly avoided the production of the most damaging key evidence that undoubtedly proves Claimant's Claims and verbalization of the facts; and the Tribunal's disregard to uphold their evidence production orders or to compel key evidence at the request of the Claimant. Secondly, the Tribunal disregard of the credible evidence of record caused

partiality; which resulted from fraudulent and false defamatory statements by the Respondent's counsel.

The magnitudes of contradictions in the Award are boundless and clearly demonstrate evident partiality and basis to a prejudice Award. In the denial of Claimant's Claims, the Tribunal acknowledges the development of FastTrack Savings in January 2005; prior to Claimant's receipt of the invalid Notice of Termination (C-159). The Tribunal in its prejudice Award does not address the significance of the non-effective termination letter; and the resulting events in the ultimate conclusion of Claimant's claims, which is obvious misconduct and clear mistake of justice.

In the Award, the Tribunal does not declare the Claimant Nutzz, to be in breach of any portion of the Agreement; and thus finding no basis for the Notice of Termination on February 10, 2005 (C-159). Nevertheless, the Tribunal acknowledges that Vertrue did not provide a cure period and did not continue to perform its obligations under the Agreement. Without an ***effective notice of termination,*** the termination attempt by Vertrue must be concluded to be invalid and thus a material breach of the Agreement. Nutzz moves the Court to vacate the Award and remand Claimant's claim(s) to a new arbitral tribunal.

**F.     Request and Motion for Sanctions**

The Petitioner(s) hereby moves this Court to grant a Motion for Sanctions. The willful misconduct and evident partially by the Tribunal are grounds for this Court to grant the Petitioner(s) request for sanctions.

The gross negligence and non-compliance by the Respondent for discovery orders and the willful misconduct by Respondent's Counsel (Mr. Cowley of Edwards Angell) to defraud the Tribunal are grounds for this Court to grant the Petitioner(s) request for sanctions.

The sanctions requested by the Petitioner(s) are for the costs and fees associated with the Motion to Vacate and the entire costs and fees associated with the Arbitration proceedings.

Dated: January 22, 2007                    _____
                                                            Alexander B. Meshkin, Pro Se

## <u>CERTIFICATE OF SERVICE</u>

I, Alexander B. Meshkin, do hereby certify that on January 22, 2007, true and correct copies of the foregoing were caused to be served upon Respondent and counsel of record at the following addresses as indicated:

Joan Warton, Esquire                        Steven M. Cowley, Esquire
Vertrue, Inc.                               Mark B Dubnoff, Esquire
20 Glover Avenue                            Edwards Angell Palmer & Dodge, LLP
Norwalk, CT 06850                           111 Huntington Avenue
**Via UPS**                                 Boston, MA 02199
                                            **Via UPS**


_____
Alexander B. Meshkin, Pro Se